UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MARCUS JACKSON,

    Petitioner,

v.

LINDA METRISH,

    Respondent.
_____/

Civil Action No.
06-CV-15464

HON. BERNARD A. FRIEDMAN

**<u>OPINION AND ORDER DENYING
PETITION FOR WRIT OF HABEAS CORPUS</u>**

      The petitioner, Marcus Jackson, a state inmate currently incarcerated at the Earnest C. Brooks Correctional Facility in Muskegon Heights, Michigan, has filed a *pro se* petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, challenging his convictions for (1) first-degree murder, MICH. COMP. LAWS § 750.316(1)(b); (2) assault with intent to murder, MICH. COMP. LAWS § 750.83; (3) armed robbery, MICH. COMP. LAWS § 750.529; (4) felony firearm, MICH. COMP. LAWS § 750.227b; and (5) possession of a firearm by a felon, MICH. COMP. LAWS § 750.224f.  He was sentenced to (1) life in prison for the first-degree-murder conviction; (2) 20 to 30 years in prison for the assault conviction; (3) 15 to 20 years in prison for the robbery conviction; (4) three to five years in prison for the felon-in-possession conviction; and (5) the mandatory two years in prison for the felony-firearm conviction.  In his *pro se* pleadings, petitioner alleges (1) that his statement was obtained unlawfully, (2) prosecutorial misconduct, (3) ineffective assistance of trial and appellate counsel, and (4) cumulative error.  For the reasons set forth below, the court shall deny the petition.

**I.  BACKGROUND**

This case arises from the shooting death of Chang Die Kim at the Dexter Beauty store in Detroit, Michigan, on June 3, 1999. Kim had been in the United States for only three months. Trial in the case began on August 6, 2001.

Carl Schmidt, a Wayne County Medical Examiner who performed the autopsy on Kim, testified that Kim was shot twice – once in the face, from a distance of between two and four feet, and once in the chest. The shot to the chest perforated the sternum and the right ventricle of the heart at the base of the aorta. Dr. Schmidt said there was no evidence of drugs or alcohol in Kim's body. He testified that he recovered a .22 caliber bullet from Kim's chest.

Christopher Kim, the victim's brother, testified that he was called to identify the body of his brother, which he did.

Yolanda Greer testified that she was waiting in line at another register with her brother, Tyrone Carswell, and her 17-month-old son, Demario Sanders, when she heard a man, at another cash register, say, "I'm tired of this mother fucking shit." (Trial Tr. vol. II, 30, Aug, 7, 2001.) Greer testified that she turned to see what was happening and saw the cashier at the other register raising his hands. She said she then saw the petitioner shoot the cashier, twice; the petitioner also fired a shot toward the front door and two or three shots in the direction of Greer. According to Greer, the petitioner then grabbed the money from the cash register and fled from the store. She said she was terrified and also ran from the store. Greer testified that she saw the petitioner get in a black Grand Prix that was parked outside, at an auto shop next to the beauty store. Greer said a woman was in the car and that the petitioner got into the car and then the car drove away. She identified the petitioner in court as the shotter. Greer's son was grazed by one of the bullets.

Myung Kim testified that she was assisting Chang Die Kim at the register when the petitioner approached. According to Myung Kim, the petitioner pointed a gun at Chang Die Kim and demanded money. She testified that the man then fired two shots, and Chang Die Kim fell to the ground. On hearing a third shot, Myung Kim said that she dropped to the ground. She identified the petitioner in court as the shooter. Myung Kim testified that she immediately identified the petitioner at a lineup held on June 7.

Another employee of the store, Nathaniel Hackett, testified that he helped the petitioner pick out a shirt and cap that morning. According to Hackett, as he proceeded to assist another customer, he heard someone say, "give me the money." (Trial Tr. vol. II, 88, Aug. 7, 2001.) Hackett said he then heard two gunshots. He testified that he saw the petitioner pointing what appeared to be a black .22 caliber revolver, and then saw Kim fall to the ground. Hackett testified that the petitioner then fired a shot at the store owner, Yong Yi, who attempted to run away. According to Hackett, the petitioner then grabbed money from the cash register and ran from the store. Hackett testified that, several days later, he was called to attend a live lineup, where he immediately identified the petitioner as the shooter. Hackett also identified the petitioner in court as the man who shot at Kim.

Yong Yi testified that on the day in question he was working at the second register when he heard the shots. He said he turned to see Chang Die Kim fall to the ground. Yi testified that he attempted to move toward the shooter, but ran when the shooter pointed the gun at him. The shooter fired a shot at Yi as he ran to the back of the store. Yi testified that he never got a good look at the shooter.

Tyrone Carswell testified that he saw a man who was holding a hat and shirt approach

3

the register. The man had a small handgun. The man said "I'm tired of fucking, you know, fucking playin' with you all." (Trial Tr. vol. II, 116, Aug. 7, 2001.) Carswell said he then heard two gunshots. He testified that he then picked up his nephew and ran to the back of the store. He said his nephew sustained a grazing wound to his head.

According to Carswell, he then saw an employee at the second register move toward the shooter. He said the shooter, however, pointed the gun at the employee, and the employee then ran toward the back of the store. Carswell testified that he saw the shooter fire a shot in his direction. He said he heard approximately three to five gunshots.

When the police officers arrived, they found the victim's body in the passageway between two counters. They found no shell casings. An evidence technician lifted fingerprints from six cassette tapes located near the counter, because it was believed that the shooter had handled tapes. Only two prints were usable. The fingerprints were not those of the petitioner or of Chang Die Kim.

Officer Anthony O'Rourke, one of the police officers who responded to the scene of the shooting, testified that he obtained a description of a car seen leaving the area from a mechanic who worked at the shop next door: "a bungee cord that held down the trunk, and I also had information that the vehicle sat lower on the driver's side front, as if there was a bad shock on that vehicle." (Trial Tr. vol. II, 125, Aug. 7, 2001.) The car was a 1980, black, two-door, Pontiac Grand Prix.

Officer O'Rourke testified that, while on patrol three days later, he saw a car matching the description of the car possibly involved in the shooting. He stopped the car as it crossed in front of Officer O'Rourke's patrol car. The car was being driven by petitioner. Through

an eight-inch opening in the trunk, Officer O'Rourke said he saw a license plate on top of the spare tire. The number of that plate differed from the plate attached to the car. The police attempted to contact the person to whom that license plate was registered, but he no longer lived at the address listed in the records. The license plate on the car comported with the VIN on the car. It was registered to Terrance Travis, petitioner's legal name. Officer O'Rourke then arrested the petitioner.

John Claybourne, another Detroit police officer, testified that he was called to preserve the scene and make a report.

Officer Steven Yakamovich testified that he identified several images extracted from the surveillance video. He explained that the position of the camera and the lens could cause distortion; he said the video had one of the lowest quality resolutions.

Investigator Barbara Simon testified next. She said she initially interviewed the petitioner during the early morning hours of June 7. According to Simon, the petitioner read and signed a written waiver of his *Miranda* rights. Simon testified that she did not take a formal statement from the petitioner at that time because another shooting had been reported and she had to cover the main desk.

Simon testified that she interviewed the petitioner about 1:00 p.m. that same day. She said she once again advised him of his *Miranda* rights, and he again waived those rights. The petitioner, in a written statement, then told Simon the following.

> It was Thursday, 6/3/99. I think it was late morning, early afternoon. I went up to the mini mall. I went inside the mall. I was walkin' around lookin' at things. I got a shirt and a black baseball cap. As I got my stuff, I went up to the counter and I paid for my shirt and baseball cap. I don't know if the man or lady opened the cash register. I pulled my gun out of my front right pant pocket– pants pocket. I point the gun and said, let me have the money. The man threw his – threw up his hands and start laughin'. I walked around

5

>the counter and I shot the man. As I shot the man, the man fell. I walked up and took the money out of the cash register. After I got the money, I came from behind the counter and I ran out of the store. I ran and got into the car with a friend and we drove off.

(Trial Tr. vol. III, 105-06, Aug. 8, 2001.)

According to Simon, the petitioner signed his statement, acknowledging that she did not threaten, or promise him anything, in order to get him to make a statement. In his statement, the petitioner also acknowledged that he was not deprived of food, water, or the use of the restroom.

Marcinda Bibbs testified for the defense. She said that on the day in question she was standing in line behind the robber. She testified that she saw the male store employee put the robber's purchases in a bag and, when a female employee opened the register, the robber said "give me the money." (Trial Tr. vol. III, 128, Aug. 8, 2001.) The employee smiled at the robber and continued to smile when he again demanded money. Bibbs then heard a gunshot, saw blood, and ran to the door. She heard more gunshots as she ran from the store. She testified that she told the police that the robber was a black male. However, when asked if the petitioner was the robber, she said yes. (Trial Tr. vol. III, 131, Aug. 8, 2001.)

Petitioner testified on his own behalf, telling a different story than he had told Simon. Petitioner claimed that he had owned a 1984 Grand Prix since early 1998, but that the mother of his son had smashed the car during the spring of 1999. He said he kept the car for parts and purchased a stolen 1986 Grand Prix from Anthony Smith for $200. He took possession of the car on June 4, 1999, and had it "retagged" by replacing the VIN with the VIN from his 1984 Grand Prix. The petitioner testified that he put the license plate from the 1984 Grand Prix on the car because Smith had taken the plate he had used for the car. He said he knew there was another license plate in the trunk, but did not think anything of it.

6

Petitioner testified that the police pulled him over in his car on June 6, but did not tell him why he had been stopped. Petitioner said they simply ordered him to the ground. He claimed that the officers searched the car, opened the trunk, and retrieved the license plate. They then took him to police headquarters.

Petitioner said that he gave general information to Officer O'Rourke at the police station. He explained that he used the name Marcus Jackson even though his name was actually Terrance Travis to "get out because of a stolen vehicle." (Trial Tr. vol. IV, 80, Aug. 9, 2001.) He admitted that he would use the name Marcus Jackson because "[i]t's supposed to be a known fact in certain areas, and if a small crime's (sic) committed, and you [use] the alias name, you get right out on bail." (Trial Tr. vol. IV, 45, Aug. 9, 2001.) He admitted that he had used the name Michael Collins in the past to obtain his release on bond. He also acknowledged using different dates of birth, and admitted that his written statement indicated that he was born on January 12, 1972, when he was actually born on January 6, 1968.

Petitioner acknowledged that Officer Littlejohn advised him of his rights and talked to him about the homicide and the car. He testified that he told Littlejohn that he had bought the car from Anthony Smith.

According to petitioner, the officers removed him from his cell about four or five times. He also acknowledged that he signed an advice of rights forms at 1:45 a.m. and 1:00 p.m. on June 7. Petitioner also acknowledged that he signed a constitutional rights form when interviewed by Littlejohn. However, petitioner said he asked both Littlejohn and Simon for an attorney.

Petitioner testified that he signed the written statement because he was told that the witnesses identified his photo, and Simon told him that she would send the warrant to the prosecutor

7

as a charge of second-degree murder. The petitioner also said that he was promised that he would serve only ten years for the crime. Petitioner denied shooting anyone. He said he had been employed as a service person for a copying company and did not need money. He denied driving the Grand Prix on June 3.

The jury found the petitioner guilty of felony murder, armed robbery, felony firearm, and felon in possession. The jury also found him guilty of assault with intent to murder, for shooting at Yong Yi, but acquitted him of assault with intent to murder with respect to Yolanda Greer's 17-month-old son, Demario Sanders. He was sentenced as stated above.

Following his sentencing petitioner, through counsel, filed his appeal of right in the Michigan Court of Appeals, raising the following claims:

I.  [Petitioner's] incriminating statement should have been suppressed where the evidence that he was held incommunicado and invoked his right to counsel was completely uncontradicted and the police reinitiated interrogation after invocation of the right to counsel.

II.  The prosecutor failed to sustain his burden of proof on the issue that [petitioner's] statement was involuntary as a result of a promise of leniency.

III.  The search of [petitioner's] automobile trunk and warrantless seizure of a license plate inside was unlawful because they were the product of an unlawful, warrantless arrest not supported by probable cause.

IV.  [Petitioner's] right to due process and a fair trial were spoiled by the prosecutor's improper conduct in cross-examination of [petitioner] and argument.

V.  There is reversible error where the trial court kept the jury from knowing that witness Dorothy Randburg was a court clerk, [not associated] with defendant or counsel and then [gave] a faulty instruction on impeachment.

VI.  The Wayne County circuit court lacked jurisdiction where [petitioner] was originally charged in file [number] 99-06197, the circuit judge dismissed the case because the prosecutor objected to the trial judge's forcing [petitioner] to proceed to trial representing himself, the prosecutor appealed to the Court

of Appeals and then issued a new complaint while that appeal was pending.

On March 18, 2003, the Michigan Court of Appeals affirmed the petitioner's convictions and sentences. *See People v. Jackson*, No. 237766, 2003 WL 1365232 (Mich. Ct. App. Mar. 18, 2003). Subsequently, petitioner filed a delayed application for leave to appeal in the Michigan Supreme Court, raising the same claims. On September 29, 2003, the Michigan Supreme Court denied the application. *See People v. Jackson*, 469 Mich. 910, 670 N.W.2d 221 (2003).

Following the Supreme Court's denial of his application, petitioner returned to the trial court and filed a post-conviction motion for relief from judgment pursuant to MCR 6.500, *et.seq*. The trial court denied that motion. *See People v. Jackson*, No. 01-2307 (Wayne County Circuit Court, Feb. 9, 2005). Petitioner's applications for leave to appeal that decision were denied by the state appellate courts. *See People v. Jackson*, No. 267915 (Mich. Ct. App. Aug. 2, 2006); *People v. Jackson*, 477 Mich. 950, 723 N.W.2d 880 (2006).

On December 11, 2006, petitioner filed the instant habeas petition. On March 17, 2008, the petitioner filed a motion to amend his petition, along with the amended petition, in which he reorganized his claims and added a Fourth Amendment claim.

## II. STANDARD OF REVIEW

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) governs this court's habeas corpus review of state court decisions. 28 U.S.C. § 2254(d) states in pertinent part:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

9

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented at the State court proceedings.

Under subsection (d)(1), a federal court may grant a writ of habeas corpus under two different clauses, both of which provide two bases for relief. Under the "contrary to" clause, a federal court may grant habeas relief if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or if the state court decides a case differently than the Supreme Court has decided on a set of materially indistinguishable facts. *See Williams v. Taylor*, 529 U.S. 362, 405-06 (2000). The words "contrary to" should be construed to mean "diametrically different, opposite in character or nature, or mutually opposed." *Id.*

Under the "unreasonable application" clause, a federal court may grant habeas relief if the state court identifies the correct governing legal principle from the Supreme Court's decisions but unreasonably applies that principle to the facts. *See Williams*, 529 U.S. at 407-08. Relief is also available under this clause if the state court's decision either unreasonably extends or unreasonably refuses to extend to a new context a legal principle from Supreme Court precedent. *See id.* at 407; *Arnett v. Jackson*, 393 F.3d 681, 686 (6th Cir. 2005). The proper inquiry for the "unreasonable application" analysis is whether the state court decision was "objectively unreasonable" and not simply erroneous or incorrect. *See Williams*, 529 U.S. at 407; *Lordi v. Ishee*, 384 F.3d 189, 195 (6th Cir. 2004).

In analyzing whether a state court decision is "contrary to" or an "unreasonable application" of clearly established Supreme Court precedent, a federal court may look only to the holdings, as opposed to dicta, of the Supreme Court's decisions as of the time of the relevant state-court decision. *See Lockyer v. Andrade*, 538 U.S. 63, 71 (2003); *Williams*, 529 U.S. at 412.

Additionally, this court must presume the correctness of state court factual determinations. *See* 28 U.S.C. § 2254(e)(1); *Cremeans v. Chapleau*, 62 F.3d 167, 169 (6th Cir.1995).

## III.  DISCUSSION

### A.  Involuntary confession claims

In his first haclaim, petitioner asserts that he repeatedly asked police officers for an attorney before he was questioned, but that his requests were ignored. In his second claim, petitioner contends an officer promised that he would only be charged with second-degree murder and be given a ten-year sentence, if he confessed. In addressing these issues, the Michigan Court of Appeals stated:

> Defendant challenges the admissibility of his statement to the police on two grounds. First, defendant argues that before he gave the statement, he repeatedly asked Investigator Simon and Officer Littlejohn for counsel, and counsel was not provided. Second, defendant argues that the statement was involuntary because it was induced by a promise of leniency made by Investigator Simon.
>
> Pursuant to *Miranda v. Arizona*, 384 U.S. 436; 86 S Ct 1602; 16 L.Ed.2d 694 (1966), if a suspect requests counsel during interrogation, the interrogation must cease until an attorney is present. *People v. Kowalski*, 230 Mich.App 464, 477-484; 584 NW2d 613 (1998). If the interrogation continues, without an attorney, and a statement is taken, "'a heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel.'" *Kowalski*, *supra*, 230 Mich.App 472, quoting *Miranda*, *supra*. A suspect, who has requested an attorney, cannot be subject to further interrogation, in the absence of counsel, unless the suspect initiates further communication. *Edwards v. Arizona*, 451 U.S. 477; 101 S Ct 1880; 68 L.Ed.2d 378 (1981); *Kowalski*, *supra*, 230 Mich.App 478. A challenge to a court's ruling on a motion to suppress evidence of a confession on the ground that it was obtained in violation of a defendant's right to counsel requires de novo review of the record, but this Court will not disturb the court's factual findings unless they are clearly erroneous. *Kowalski*, *supra*, 230 Mich.App 471-472.

> Although defendant challenged the failure to provide him with counsel, the trial court did not fully address the issue at the evidentiary hearing. Ordinarily, the appropriate remedy would require remanding to the trial court for resolution of this issue because it requires an assessment of the credibility of the witnesses. However, that remedy is unnecessary here. The admission of the statement, even if erroneous, was harmless beyond a reasonable doubt in light of the other evidence of defendant's guilt. *See Arizona v. Fulminante*, 499 U.S. 279, 295; 111 S Ct 1246; 113 L.Ed.2d 302 (1991); *People v. Whitehead*, 238 Mich.App 1, 7-10; 604 NW2d 737 (1999). Here, four witnesses to the shooting identified defendant. In addition, the car defendant was driving, when he was stopped, matched the physical description given by witnesses. The license plate seen by one witness was found in the trunk of the car defendant was driving. The proof of defendant's guilt was so overwhelming that all reasonable jurors would have found guilt even without the confession. *Whitehead*, supra, 238 Mich.App 10. Because the admission of the confession, even if error, was harmless, we need not remand for further findings to resolve whether the confession was erroneously admitted.
>
> In the interests of judicial expediency, we need not resolve whether defendant's statement should have been suppressed because it was induced by an improper promise of leniency by Investigator Simon. Assuming without deciding that the admission of the statement was error, the error was harmless in light of the overwhelming evidence of defendant's guilt even without the confession. *Whitehead*, *supra*, 238 Mich.App 6. Having reached that conclusion, we need not determine whether the admission of the statement was error. *Id.* at 13.

*People v. Jackson*, 2003 WL 1365232, at \*\*1-2.

Established law holds that statements of an accused made during custodial interrogation are inadmissible unless the accused voluntarily and knowingly and intelligently waives his Fifth Amendment rights. *Miranda*, 384 U.S. at 444. If a suspect requests counsel during a custodial interrogation, the police may not question him until counsel is made available. *See Edwards v. Arizona*, 451 U.S. 477, 484 (1981).

Additionally, the AEDPA has "drastically changed" the nature of habeas review.

*Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001). "AEDPA requires heightened respect for state court factual and legal determinations." *Lundgren v. Mitchell*, 440 F.3d 754, 762 (6th Cir. 2006) (internal quotations omitted). If a state court has adjudicated the claim, deferential AEDPA standards must be applied pursuant to 28 U.S.C. § 2254(d).

Even if a state court disposes of a constitutional claim without articulating its analysis, deferential review is required. The Sixth Circuit describes the review AEDPA requires under such circumstances as a "modified form of AEDPA deference." *Maldonado v. Wilson*, 416 F.3d 470, 475 (6th Cir. 2005); *Howard v. Bouchard*, 405 F.3d 459, 468 (6th Cir. 2005). Under the modified standard, a federal habeas court must conduct an independent review of the record and applicable law to determine whether, under the AEDPA standard, the state court decision is contrary to federal law, unreasonably applies clearly established law, or is based on an unreasonable determination of the facts in light of the evidence presented. The independent review, however, is not a full de novo review of the claims. As the Sixth Circuit held in *Harris v. Stovall*, 212 F.3d 940, 943 (6th Cir. 2000), this standard requires the court to conduct a careful review of the record and applicable law, but nonetheless bars the court from reversing unless the state court's decision is contrary to or an unreasonable application of federal law. *See Maldonado*, 416 F.3d at 476.

Further, in *Fry v. Pliler*, 551 U.S. 112 (2007), the Supreme Court held that in 28 U.S.C. § 2254 proceedings, a federal court must assess the prejudicial impact of constitutional error in a state-court criminal trial under *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993), which held that "on habeas review, however, the petitioner must establish that the error 'had a substantial and injurious effect or influence in determining the jury's verdict.'" *Fry*, 551 U.S. at 116.

In the present case, the record demonstrates that petitioner waived his right to counsel

and did not request an attorney. He admitted, at the evidentiary hearing held on September 24, 1999, and at trial, that he signed a written waiver of constitutional rights form when questioned by the police. He also admitted signing another waiver form before a second interview on the following day. The interviewing officers testified that petitioner never requested an attorney. However, petitioner claimed that, despite signing the forms, he verbally requested an attorney.

Nonetheless, given the record presented, the court concludes that the result reached by the Michigan Court of Appeals was not contrary to, or an unreasonable application of, clearly established Supreme Court precedent. The evidence against petitioner was overwhelming; four witnesses to the shooting identified petitioner, the car petitioner was driving when stopped by the police matched the description given, and the license plate in the trunk of that car matched that of the one seen by one of the witnesses. Thus, even if the statement was admitted in error, under the *Brecht* analysis, the error was harmless in light of the overwhelming evidence.

Against that backdrop, the court finds that any error in admitting petitioner's statements did not have a substantial and injurious effect, because the evidence of his guilt was so overwhelming that he surely would have been convicted even without use of the statement. Petitioner was found guilty not because of his statement, but because the eyewitnesses' testimony left no question as to his culpability. As for petitioner's second claim, under well established Supreme Court law, a confession is involuntary where, under the totality of the circumstances, it is coerced by threats or promises. *See Arizona v. Fulminante*, 499 U.S. 279, 287 (1991). Petitioner claimed that he was promised leniency by one officer. The trial court heard the conflicting testimony and believed the officer's version and not petitioner's. Based on the law cited, this court cannot second guess the trial court's decision. The court therefore concludes that petitioner is not

entitled to habeas relief regarding these claims.

### B. Remaining Claims

Regarding petitioner's Fourth Amendment claim, the federal court's review of that claim is barred by *Stone v. Powell*, 428 U.S. 465 (1976). Petitioner argues that an illegal search was performed and that the evidence, the seized license plate, that led to his arrest should have been suppressed as fruit of the poisonous tree. On appeal, the Court of Appeals held that the issue was not preserved for review; however, the court reviewed petitioner's claim under the plain error standard, and denied relief:

> Defendant contends that the trial court erred in admitting evidence of a license plate retrieved from the trunk of his car because it was the product of a search following his arrest, which defendant claims was unlawful because it was not supported by probable cause. The issue is not preserved because defendant challenged the admissibility of the evidence on a different basis at the trial court level. An objection raised on one ground is insufficient to preserve an appellate attack based on a different ground. *People v. Thompson*, 193 Mich.App 58, 62; 483 NW2d 428 (1992). Because this issue is unpreserved, we review for plain error in accordance with *People v. Carines*, 460 Mich. 750, 763; 597 NW2d 130 (1999).
>
> The analysis of probable cause depends on the facts available to the officer at the moment of arrest. *See People v. Oliver*, 417 Mich. 366, 374; 338 NW2d 167 (1984). Here, the parties disagree about when defendant was arrested, specifically, whether defendant was arrested before the officer saw a license plate in the partially open trunk that matched the one seen by a witness.
>
> The similarity between the description of the getaway car and defendant's car provided reasonable suspicion justifying an investigative stop. The car matched not only the make, model and color, but also had a bungee cord securing the trunk and a lower driver's side, as had been described by witnesses. These facts provided "something more than an inchoate or unparticularized suspicion or hunch . . . ." *People v. Rizzo*, 243 Mich.App 151, 156; 622 NW2d 319 (2000) (citations and internal quotation marks omitted). "If an investigative stop of an automobile is proper, the

> officer is permitted to briefly detain the vehicle and make reasonable inquiries aimed at confirming or dispelling his suspicions." *Rizzo*, *supra*, 243 Mich.App 156. (Citations and internal quotation marks omitted).
>
> Here, defendant's argument is premised on an unproven assertion that he was arrested immediately after the police stopped his car. However, the record does not clearly indicate when defendant was arrested. The detention of an individual during an investigatory stop may be a reasonable safety precaution. *Compare People v. Nimeth*, 236 Mich.App 616, 619, 624; 601 NW2d 393 (1999) (the defendant was not arrested, but only detained as a reasonable safety precaution, when he was handcuffed and placed in the back of a patrol car during a stop). Defendant relies, in part, on the officer's affirmative response to the question, "And when you stopped the vehicle you placed the man under arrest?" However, the officer's characterization of an arrest is not controlling. *People v. Cipriano*, 431 Mich. 315, 342; 429 NW2d 781 (1988).
>
> Assuming arguendo that defendant was arrested before the discovery of the license plate, we believe that the match between defendant's car and that described by the witnesses, particularly the unique features of the bungee cord securing the trunk, provided probable cause to arrest defendant. Defendant has not established plain error.

*People v. Jackson*, 2003 WL 1365232, at **2-3.

Federal habeas review of a petitioner's arrest or search by a police officer is barred "where the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim . . ." *Stone*, 428 U.S. at 494. Specifically, the state must have provided, in the abstract, a mechanism by which the petitioner could raise the claim, and presentation of the claim must not have been frustrated by a failure of that mechanism. *See Machacek v. Hofbauer*, 213 F.3d 947, 952 (6th Cir. 2000). "The opportunity to litigate encompasses more than an evidentiary hearing in the trial court." *Marshall v. White*, 2006 WL 1791383, at *5 (E.D. Mich. June 27, 2006). It also includes corrective action available through the trial and appellate process on direct review of the

16

conviction. *Machacek*, 213 F.3d at 952 (Fourth Amendment habeas claim not cognizable because claims were carefully "considered and rejected" at the Michigan trial and appellate levels).

"Michigan has a procedural mechanism that presents an adequate opportunity for a criminal defendant to raise a Fourth Amendment claim." *Kelley v. Jackson*, 353 F. Supp.2d 887, 893 (E.D. Mich. 2005) (citing *People v. Ferguson*, 376 Mich. 90, 135 N.W.2d 357, 359 (1965) (Fourth Amendment claims may be raised by filing a pre-trial motion to suppress)). Michigan appellate courts also provide a mechanism to review Fourth Amendment claims when it appears the evidence in question affected the outcome of the trial. *See Kelley*, 353 F. Supp.2d at 893. The court therefore concludes that petitioner is not entitled to habeas relief on this claim.

Petitioner's remaining claims were first presented to the state courts during petitioner's motion for relief from judgment and subsequent appeal. Both state appellate courts denied relief with respect to those claims by using the common form order stating that the appeal was denied "for failure of the defendant to meet the burden of establishing entitlement to relief under MCR 6.508(D)."

It is well established in this circuit that the procedural bar set forth in Rule 6.508(D) constitutes an adequate and independent ground on which the Michigan Supreme Court may rely in foreclosing review of federal claims. *Howard*, 405 F.3d at 477. In *Burroughs v. Makowski*, 282 F.3d 410, 413-14 (6th Cir. 2002), the Sixth Circuit considered the form order used by the state appellate courts here and found that it presented a sufficient explanation that the ruling was based on the failure to comply with a state procedural rule. *See also McFarland v. Yukins*, 356 F.3d 688, 697-98 (6th Cir. 2004). Where a state court denies relief on independent and adequate state procedural grounds, as the state courts did here, a prisoner may obtain habeas review of such claims

17

only if he can establish "cause and prejudice" or that the failure to review the claims would result in a "fundamental miscarriage of justice." *Strickler v. Greene*, 527 U.S. 263, 288 (1999). In order to establish "cause" to excuse his default, a habeas petitioner must establish that some objective factor external to his defense prevented him from complying with the state procedural rule. *See Murray v. Carrier*, 477 U.S. 478, 488 (1986).

In the present case, petitioner asserts that the ineffectiveness of his appellate counsel constitutes cause to excuse his failure to raise these claims during his appeal of right. In order for attorney error to constitute cause, it must rise to the level of ineffective assistance of counsel under the standard of *Strickland v. Washington*, 466 U.S. 668 (1984). *See Byrd v. Collins*, 209 F.3d 486, 526 (6th Cir. 2000). Petitioner's appellate counsel raised several issues in his appeal of right in the Michigan Court of Appeals. While appellate counsel did not raise every conceivable claim, the Supreme Court has held that failure to raise every colorable argument does not constitute ineffective assistance of counsel: "A brief that raises every colorable issue runs the risk of burying good arguments – those that, in the words of the great advocate John W. Davis, 'go for the jugular' – in a verbal mound made up of strong and weak contentions." *Jones v. Barnes*, 463 U.S.745, 753 (1983).

As petitioner has completely failed to establish cause for his default, there is no need to address the prejudice component. *See Smith v. Murray*, 477 U.S. 527, 533 (1986); *Long v McKeen*, 722 F.2d 286, 289 (6th Cir. 1983). Since petitioner procedurally defaulted his claims by failing to present them to the state courts in a timely filed appeal of right, and since he is unable as a matter of law to show cause and prejudice, review of these claims is barred.

## IV.  CONCLUSION

For the reasons stated above, the court concludes that the petitioner is not entitled to federal habeas relief on the claims presented in his petition.  Accordingly,

IT IS ORDERED that the petition is this matter is denied.

　　　　　　　　　　　　　　　　S/Bernard A. Friedman
　　　　　　　　　　　　　　　　Bernard A. Friedman
　　　　　　　　　　　　　　　　United States District Judge

Dated:  November 13, 2009

I hereby certify that a copy of the foregoing document was served upon Marcus Jackson and counsel of record on November 13, 2009, by electronic and/or ordinary mail.

　　　　　　　　　　　　　　　　S/Carol Mullins
　　　　　　　　　　　　　　　　Case Manager